HENRY LLOYD FOLSOM, EXECUTOR OF THE LAST WILL AND TESTAMENT OF HENRY T. FOLSOM, DECEASED, PROSECUTOR-APPELLANT, v. J. H. THAYER MARTIN, STATE TAX COMMISSIONER, DEFENDANT-RESPONDENT.

Submitted January 21, 1941—Decided May 12, 1941.

"Henry T. Folsom died, testate, February 26th, 1937, aged 77 years, resident of this state, leaving a gross estate of $26,517.57. The liability to transfer inheritance tax in respect thereto is not in dispute. The Commissioner however added to the 'taxable estate' the sum of $108,747.15, the aggregate value of 1,065 shares of stock transferred by decedent to his son on March 31st, 1932. The decedent was then aged 72, and this was approximately five years before his death.

"The Commissioner found that this transfer was made in contemplation of death; and assessed tax in respect thereof. The correctness of this finding is the sole issue on the appeal.

"The burden is upon the appellant to establish that the finding as to this gift was erroneous,—not supported or justified by the facts. *In re Dupignac,* 96 *N. J. Eq.* 284, 125 *Atl. Rep.* 119; *In re Hall,* 94 *N. J. Eq.* 398, 119 *Atl. Rep.* 669.

Consideration of the evidence leads to the conclusion that in this the appellant has not succeeded; and that the Commissioner's finding was correct.

"It appears from the proofs that decedent's father in 1888 incorporated the H. and D. Folsom Arms Co., a sporting goods business, all of the stock of which was held by members of the Folsom family; that upon the father's death (prior to the birth of any grandchildren) he left 1,065 shares (of a total issue of 2,145) to his wife (decedent's mother), expressing the wish that she in turn leave the stock to decedent and his sister; that the latter predeceased the mother; that the mother, decedent and his son (the present appellant) lived together until the son's marriage; that decedent served as president and secretary and the son as vice-president of the company,—each receiving a like remuneration; that decedent's mother told him and the son that she did not feel right about leaving the whole 1,065 shares to decedent,—that she believed that, had her husband (the grandfather) known the grandson, he would have provided for a different disposition of these shares,—at least as to the portion he had asked her to transfer by will to his daughter; that she made no change in her will because the grandson requested her not to do so; that upon her death in September, 1929, the 1,065 shares were bequeathed to decedent; and that two and a half years later, on March 31st, 1932, decedent transferred these shares to his son, retaining 54 additional shares that he owned.

"It was, and is, appellant's contention that this transfer was not made in any contemplation of death; that the sole impelling motive therefor was decedent's desire to effectuate the express wish of his deceased mother.

"It is urged that decedent, despite his 72 years, was in good health at the time of the transfer, and that, until two years before his death (three years after the transfer was made), he had no cause for a contemplation of the actual imminence or probability of death in the not distant future, and that there is nothing to show that he had any such contemplation.

"The proofs show, however, that on March 31st, 1932, the decedent felt ill, and complained of a feeling of numbness in

two of his fingers; that Dr. Harvey, the family physician, being summoned, made on that day a thorough examination which disclosed the fact that decedent's heart was irregular; that the doctor thought it necessary 'under the circumstances and because of his age' to have decedent remain in bed so that he could obtain complete rest and quiet; that, while the doctor did not consider his condition serious, and while all traces of the attack disappeared in about two weeks, decedent's heart continued to be irregular; that after a month's confinement decedent resumed his business activities and continued to take short fishing and hunting trips; and that in 1935 decedent's mental and physical condition began noticeably to deteriorate.

"The transfer in question was made on the same day on which this heart attack took place.

"In and by the death certificate, Dr. Harvey certifies that he attended decedent from February, 1932, until his death on February 26th, 1937; that the causes of death were myocarditis and cerebral arteriosclerosis. While merely the year '1932' is given as the date of onset of these causes, it would seem that the actual date of the onset was on or prior to March 31st, 1932 (the date of the transfer) inasmuch as after recovering from the attack suffered on that day, decedent had no cause for again summoning the physician in that year. Dr. Harvey's certification that he attended decedent in February, 1932, and his testimony that (although he had never prior to March 31st, 1932, had occasion to examine decedent for a *heart condition*), 'it is entirely possible that his heart may have been irregular prior to March 31st, 1932,' is of significance in this regard,—as is also the son's testimony that decedent 'began a number of years ago not feeling so well but he kept on going to the office just the same.'

"In view of all the evidence, the conclusion is inescapable that by reason of his 'slight stroke,' his age and condition, decedent must certainly have contemplated and considered,— at the time he made the transfer,—the approach of death as being, while *perhaps* not a matter of imminence or *necessarily* in the definitely near future, nevertheless not a matter of vague and distant future; as being an end which must

inevitably come, and which there was reasonable cause to believe might occur in the not distant future,—and in respect of which it would be reasonable and prudent to make provision.

"By his will, executed on April 1st, 1932, (the day following the transfer *sub judice*) decedent, after providing for the payment of his just debts as soon after his decease as convenient, gave, devised, and bequeathed all the residue and remainder of his estate to his son and appointed him executor thereof.

"The will was of course necessarily made in contemplation of the testamentary final disposition and distribution of his estate at his death; and it appears from the proofs that some time prior to the execution thereof, decedent, after frequently speaking of rewriting his will, had destroyed a prior will and had instructed the drafting of a new will. The fact that the day prior to the execution thereof, decedent, then 72 years of age and ill from the effects of a 'slight stroke' suffered on that very day, made a gift of approximately 81% of his estate to the one whom he had determined to make the sole beneficiary of his testamentary estate and in the same manner as was to be provided in the will, creates a very strong inference that the contemplation of death was the impelling motive for the transfer. *Cf. In re Grabfelder,* 107 *N. J. L.* 520, 153 *Atl. Rep.* 532. That *one* of the reasons for his having the will redrafted was the fact of the death of the witnesses thereto does not detract from the strength of this inference.

"Appellants however argue that the facts that decedent knew his mother had desired that his son should receive the 1,065 shares (or at least the 'aunt's portion' thereof) at her death; that he knew of his son's unselfish act in discouraging his grandmother's determination to change her will in his favor; that decedent transferred to the son only those shares he had inherited from the grandmother, retaining the ownership of 54 additional shares—all these strongly indicate that the decedent's sense of moral obligation alone prompted the making of the transfer, and that a contemplation of death was not an impelling motive therefor. Not so.

"Decedent's retention of the whole block of stock for two

and a half years after his mother's death—although he knew she had expressed a desire that the grandson (his son) should receive at least some portion thereof at the time of her death— indicates that the desire to effect her wishes in this matter was not the thing which actually caused him to make the gift when he finally made it. *Cf. In re Gradfelder, supra.* This seems particularly so in view of the following facts, to wit— that decedent during the period between his mother's death and the transfer not only received an average annual salary of more than $13,000, but also the income from a $40,000 trust fund; that his son, who received a like remuneration from the company, wished to have his family live with and care for decedent (as they did at decedent's request during the two years prior to his death); that decedent received no income from the stock—no dividends having been paid thereon for more than ten years prior to the date of the transfer *sub judice* (and none thereafter); that during the decedent's period of ownership the business was conducted at a loss and the stock had no market value; and that decedent was therefore totally unable to realize anything on the stock inasmuch as any sale thereof would have necessitated the transfer of a controlling interest in the business to outside parties—and it was always the intention of the family to retain full ownership thereof.

"Moreover, there is nothing to show that decedent's mother had expressed a wish that the whole block of 1,065 shares be turned over to the grandson at her death. She had intended to carry out her husband's request that the decedent and sister succeed to the ownership of the stock (presumably in equal shares). The fact of the latter's death created a doubt in her mind as to how she could then best effectuate her deceased husband's desires. It would seem from the testimony that she concluded this could best be done under the altered circumstances by the distribution of the 'aunt's share' to her grandson. That she should desire that *all* the stock be given to the grandson is highly improbable inasmuch as this would involve a disregard for her husband's express wish that a portion thereof (presumably one-half) should be left to the decedent.

"There is the further fact that during his mother's later years decedent was, and intended to continue as, the active head of the company. It is improbable therefore that she wished to deny him any voting power therein (at least as to the portion of stock her husband had wanted him to have)— particularly so in view of the probability that the grandson would receive no income from the stock and that he would, as a member of the family and officer of the company, eventually receive it from the decedent (who was 69 years of age at the date of his mother's death) as testamentary beneficiary of decedent's estate.

"In view of the fact that *prior* to March 31st, 1932, (the date of transfer) decedent had contemplated the execution of a new will and had given instructions for the drafting thereof so as to make his son his sole beneficiary; and on the day following the transfer effected the execution, it would seem that appellant's contention—that decedent's sole concern on March 31st was the fulfillment of the moral obligation to transfer to his son the shares he had inherited from his mother—is untenable. He had been perfectly able to fulfill this obligation at any time during the two years and a half before he did so, and it would seem that the 'slight stroke' suffered on March 31st prompted him to effect the transfer on that day, as well as also to effect the execution of the will on the following day.

"Obviously and necessarily, therefore, the gift to the son and the will executed but a day thereafter were parts of a general 'testamentary' plan or plan for the ultimate disposition of his whole estate; and the gift to the son was intended and made in lieu of a testamentary disposition. Hence it was made in contemplation of death, and was taxable. *Schweinler* v. *Martin,* 117 *N. J. Eq.* 67, 175 *Atl. Rep.* 71; *affirmed,* 13 *N. J. Mis. R.* 722, 180 *Atl. Rep.* 774; *Milliken* v. *United States,* 283 *U. S.* 15, at 22-23; *United States* v. *Wells,* 283 *U. S.* 102, at 116-7; *McCaughn* v. *Real Estate Title and Trust Co.,* 297 *U. S.* 606.

"It of course clearly appears that, in addition to the desire and purpose to provide for the ultimate disposition of approximately 4/5 of his estate, decedent in making some part of the

*inter vivos* transfer had also in his mind the thought of fulfilling a moral obligation. However, as hereinbefore stated, he had been amply in a position to accomplish the fulfillment of such obligation at any time during the two and a half years he had owned the stock, and he had known of the obligation at the time he received the property. The fact that it was not until the day he suffered a 'slight stroke,' and not until after he had outlined the testamentary disposition of his estate that the gift *sub judice* was made, leads this court to the conclusion that the controlling cause for the making of the gift was not the desire to fulfill the moral obligation, but was 'contemplation of death'—the desire to make a disposition of his estate in lieu of a testamentary disposition. That it is not requisite that the contemplation of death shall have been the sole cause for the making of the gift is well settled. *In re Grabfelder, supra; In re Schweinler, supra; In re Hartford,* 122 *N. J. Eq.* 489, 194 *Atl. Rep.* 800.

"There was ample evidence to justify the Commissioner's finding; indeed the weight of the evidence supports it. Appellant has failed to establish error by the Commissioner: and the tax will be affirmed."

Before Justices CASE, DONGES and HEHER.

For the prosecutor of the rule, *Alfred J. Grosso* and *Morris M. Schnitzer.*

For the respondent, *David T. Wilentz,* Attorney-General, and *William A. Moore.*

PER CURIAM.

The matter is before us on rule to show cause why a writ of *certiorari* should not issue to review a decree in the Prerogative Court which affirmed the assessment of a transfer inheritance tax by the State Tax Commissioner on the estate of Henry T. Folsom, deceased, in the amount of $2,436.36. With the papers comes the stipulation that if it is determined that a writ of *certiorari* should issue the merits of the controversy and the arguments and briefs of counsel on the return of the rule may be considered by the court as if a writ of

*certiorari* had been issued and the records and depositions had been returned pursuant to the writ.

The ultimate question for decision is whether the testator in transferring to his son 1,065 shares of stock of H. & D. Folsom Arms Company made a gift "in contemplation of death" within the meaning of *R. S.* 54:34-1(c).

We have made an independent re-examination of the facts. *Scheider* v. *Martin,* 124 *N. J. L.* 567. We have weighed the evidence and made our own factual findings; and we conclude that the weight of the evidence supports the assessment. The depositions taken under the rule do not substantially alter the tenor of the earlier proofs. We are in accord with the Vice-Ordinary's review of the facts and his conclusion thereon that the weight of the evidence supports the Commissioner's finding. We differ from so much of his opinion as places the the burden of proof in such an instance upon the taxpayer. Our construction of the law was stated in *Moore* v. *Martin,* 125 *Id.* 189—decided after the filing of the Vice-Ordinary's opinion in the instant case—namely, that when the transfer is not made within two years prior to the death of the donor, the onus of establishing, by evidence, that the gift was made in contemplation of death rests upon the taxing authorities.

In view of our determination on that point of law, we shall assume, in accordance with the stipulation, that the case is before us on its merits.

The decree below is affirmed, without costs.